CHARLOTTE HARBOR & NORTHERN RAILWAY COMPANY, A CORPORATION, *Plaintiff in Error*, v. C. ROY BUCHAN, *Defendant in Error.*

Opinion filed April 28, 1916.

Rehearing denied May 18, 1916.

1. A motion for a new trial duly made during term time may be disposed of in vacation.

2. Where the evidence is legally insufficient to support the verdict, the judgment entered upon the verdict will be reversed.

Writ of Error to Circuit Court, DeSoto County; F. A. Whitney, Judge.

Judgment reversed.

*McKay, Withers & Phipps*, for Plaintiff in Error;

*Leitner & Leitner*, for Defendant in Error.

PER CURIAM.—Buchan recovered a judgment against the carrier for a carload of watermelons which the carrier did not on June 8th, 1912, "take and deliver."

A motion is made here to strike the bill of exceptions on the ground that the motion for new trial, though made during the term of court, was disposed of in vacation. The motion is made upon the theory that the court is without jurisdiction to pass upon a motion for new trial except in term time.

Sections 2 and 3, Chapter 5403 Acts of 1905, are as follows:

"Sec. 2. The Judge shall have the power to hear and determine any motion for new trial in vacation and any such adjudication thereof in vacation shall be entered in the minutes of the court and shall have the like force and effect as if made during term time.

"Sec. 3. The provisions of this act shall not apply to criminal causes." Sec. 1343a Compiled Laws of 1914.

The motion for new trial having been, as contemplated by the statute, "made within four days after the rendition of the verdict and during the same term," and not having been disposed of during term time, the motion was properly disposed of during vacation. The motion to strike is denied.

· The plaintiff testified that "I live at McCall, Florida. During June, 1912, I requested the Charlotte Harbor & Northern Railway Company to place a car for me on the siding at McCall to be loaded with watermelons. McCall is a non-agency station; that is, there is no agent kept at the station house, but patrons of the Railway Company

are accustomed to receiving goods from the conductors on freight trains or from the platform at the station where they are deposited by the conductors; and in making shipments the goods are tendered to the conductors on the freight train and he issues a way bill or bill of lading therefor. This was the practice followed by the Railway Company in June, 1912. At that time the Charlotte Harbor & Northern Railway Company was maintaining a tri-weekly north bound freight service according to schedule; that is, a freight train going north through McCall was due on Saturday morning, Tuesday morning and Thursday morning each week. On the morning of Saturday, June 8th, 1912, the regular freight train came through according to schedule and the conductor asked me if my car of melons was ready to move and I told him it was not loaded, and he thereupon proceeded with his train. At that time the defendant railway company was operating a passenger train each way daily. The southbound passenger train was due to pass through to Boca Grande, the southern terminus of the company, in the morning, and the northbound passenger train was due to pass through McCall going to Mulberry, in Polk County, the northern terminus of the company, in the afternoon. At times these passenger trains have hauled perishable freight for me. The southbound passenger train did not come through McCall on June 8th, 1912, and about four o'clock in the afternoon a locomotive with a freight box car attached to it came through going north. This train was running about on the schedule of the regular northbound passenger train due on that date, and which passenger train did not run. This train stopped at McCall and I found Mr. N. H. Goucher, superintendent of transportation of the defendant railway company, and Mr. L. Barwick, chief clerk to

the general manager of the defendant railway company, in charge of it. Mr. Goucher asked me if I had anything to go north, stating he could carry it to Arcadia, which is an intermediate point on the line of the Charlotte Harbor & Northern Railway Company, and that there had been a washout beyond Arcadia which prevented operation of trains any further north than Arcadia and had stopped the southbound passenger train that morning, for which reason he was running this emergency train on the northbound passenger train schedule to take care of any emergency local business between Boca Grande and Arcadia. I gave him the mail from the postoffice, as I was postmaster, and also some small packages of freight, and I told him I had a car of watermelons to move. I had the bill of lading made out and in my pocket. He asked me where it was and I pointed to it on the siding and he said he did not have time to take it then but would get it on Monday. I was willing to pay the freight on the car but it was not demanded of me. No bill of lading was made out or delivered to me. After that train left there was no other train passing McCall on the line of the defendant company except construction trains for several weeks, with the exception of two passenger trains, one each way, which ran the next day, Sunday 9th. Sunday night, June 9th, the big bridge across Peace River between McCall and Arcadia, was washed out, and traffic in the usual course of business was suspended on the Charlotte Harbor & Northern Railway for about three weeks. There is no point between the southern terminus of the Charlotte Harbor & Northern Railway Company at Boca Grande and the point where the bridge over Peace River washed out at which the Charlotte Harbor & Northern Railway Company has a physical connection with any other railroad

line. During the time while traffic was suspended, as before stated, the watermelons in the car rotted and when traffic was resumed employees of the defendant railway company threw the melons out of the car."

A witness for the defendant testified: "I am Superintendent of the Charlotte Harbor & Northern Railway Company and held that position on June 8th, 1912. At that time the said railroad was opening a tri-weekly freight service each way. Northbound freight trains, according to schedule, were due to go north from Boca Grande, in Lee County through McCall and Arcadia, in DeSoto County, to Mulberry, in Polk County, on the morning of Saturday, Tuesday and Thursday of each week. McCall is a non-agency station between Boca Grande and Arcadia. There is no physical connection between the Charlotte Harbor & Northern Railway and any other railroad at any point between Boca Grande and Arcadia. On the morning of June 8th, 1912, the regular freight train went north from the southern terminus of our line at South Boca Grande to the northern terminus at Mulberry, in Polk County, but the southbound passenger train was held up at a point a few miles above Arcadia because of a washout that had occurred. During May and June, 1912, there was an unusual amount of rain and the creeks and rivers had risen so that we were having a large amount of trouble in keeping our track in such condition that trains could be operated over it. This washout that occurred above Arcadia on June 8th, 1912, prevented the southbound passenger train from coming into Arcadia on that day, and therefore, left us without a passenger train running north from Boca Grande on the afternoon's schedule. To meet this emergency and take care of the mail service, express and passengers who were willing to put up with such accommodation, I took

a locomotive and attached a freight box car to it and came north from Boca Grande on or about the schedule of the afternoon northbound passenger train on June 8th, 1912. Mr. L. Barwick, chief clerk to the general manager of our company, was with me on the train. About four o'clock in the afternoon we reached McCall. I stopped the train at that point and saw Mr. Buchan, the plaintiff in this case, who keeps a store at McCall, and who was postmaster. I asked him if he had anything to go north and told him there had been a washout above Arcadia which had held up the regular passenger train, and that I was running this emergency train into Arcadia in place of the afternoon's northbound passenger train. He gave me the mail, and I think a few packages of vegetables to go by express. I asked him if he had anything else to go and he said he had a car of watermelons. I asked him where it was and he pointed to a car which was located on the siding about three hundred feet from where the train had stopped. At that time a wagon was up against the car and I could plainly see that they were loading melons from the wagon into the car. I asked him if he had his bill of lading made out for the car and he said the car was not ready to move. I then gave orders for the train to proceed and we left McCall station. I would have taken the car on that train if it had been ready. The next day, Sunday, June 9th, 1912, the morning passenger train came through to Boca Grande and came back north that afternoon, but that night, Sunday, June 9th, 1912, the big bridge across Peace River between Boca Grande and Arcadia was washed out by the rapid rising of the river, due to the heavy rains that had occurred, and it was from that time on about three weeks before we were able to operate any trains except construction trains engaged in repairing the road-

way over any point passing through McCall to any point where we had a physical or interchange connection with the line of any other railroad company. This is the reason why the carload of melons which Mr. Buchan was loading on Saturday, June 8th, 1912, was not hauled by our company."

Another witness for the defendant testified: "I was in the car with Mr. Goucher on the afternoon of Saturday, June 8th, 1912. I saw the car that was being loaded with watermelons by Mr. Buchan. That car was on the siding about three hundred feet from where the train stopped. I saw melons being loaded from a wagon into the car as the train stopped at McCall. Mr. Goucher asked Mr. Buchan if he had anything to go north and told him of the washout that had occurred above Arcadia. Mr. Buchan gave Mr. Goucher the mail and some packages of express, and Mr. Goucher asked him if he had anything else to go and Mr. Buchan said he had a car of melons. Mr. Goucher then asked him where the car was and Mr. Buchan pointed to the car that was being loaded. Mr. Goucher asked Mr. Buchan if he had his bill of lading made out and Mr. Buchan said that the car was not ready and upon orders from Mr. Goucher the train proceeded north. With the exception of two passenger trains, one each way, which operated the following day, Sunday, June 9th, 1912, all traffic except work trains was suspended on the Charlotte Harbor & Northern Railway between Arcadia and Boca Grande from that time for about three weeks on account of the bridge over Peace River between McCall and Arcadia having been washed out by the rising of the river on the night of Sunday, June 9th, 1912."

It appears that the plaintiff did not have his car loaded when the regular freight train passed McCall on

the morning of June 8th. The plaintiff testified that when the emergency train passed McCall he told the person in charge of such train that he "had a car of watermelons to move." "No bill of lading was made out or delivered to me." This is not testimony that the car of melons was loaded and ready for shipment when the emergency train passed McCall. Witnesses for the defendant testified that the plaintiff "said he had a car of watermelons. I asked him where it was and he pointed to a car which was located on the siding about three hundred feet from where the train had stopped. At that time a wagon was up against the car and I could plainly see that they were loading melons from the wagon into the car. I asked him if he had his bill of lading made out for the car and he said the car was not ready to move. I then gave orders for the train to proceed and we left McCall station. I would have taken the car on that train if it had been ready." "I saw the car that was being loaded with watermelons by Mr. Buchan. That car was on the siding about three hundred feet from where the train stopped. I saw melons being loaded from a wagon into the car as the train stopped at McCall. Mr. Goucher asked Mr. Buchan if he had anything to go north and told him of the washout that had occurred above Arcadia. Mr. Buchan gave Mr. Goucher the mail and some packages of express, and Mr. Goucher asked him if he had anything else to go and Mr. Buchan said he had a car of melons. Mr. Goucher then asked him where the car was and Mr. Buchan pointed to the car that was being loaded. Mr. Goucher asked Mr. Buchan if he had his bill of lading made out and Mr. Buchan said that the car was not ready and upon orders from Mr. Goucher the train proceeded north."

This evidence shows the car of watermelons was not

ready for shipment when the emergency train passed Mc-Call, and no right by custom or otherwise is shown by the plaintiff to have the carload of watermelons carried by a passenger train. After the emergency train passed McCall the defendant could not because of the washouts reasonably have been required to move the loaded car of melons before the melons rotted.

The judgment is reversed.

TAYLOR, C. J., and SHACKLEFORD, COCKRELL, WHIT-FIELD and ELLIS, JJ., concur.

PER CURIAM.—In a petition for rehearing it is suggested that the court misconstrued the contention of the defendant in error on the motion to strike the bill of exceptions. The contention is "that a trial court has no jurisdiction to pass upon a motion in vacation, unless during the term time, the court made an order that the said cause be heard in vacation."

The statute provides that "motions for new trials in civil cases shall be made within four days after the rendition of the verdict and during the same term, but the judge upon cause shown may within such four days and during the same term by order extend the time for the making and presentation of such motions, not to exceed fifteen days from the rendition of the verdict. In cases of extension of time for making such motions, a copy of the motion to be presented to the judge shall be served on the opposite party or his attorney with three days notice of the time and place that the same will be presented and heard. It shall not be necessary to incorporate in any motion for a new trial any matter *in pais* previously excepted to, for the purpose of having the same reviewed

by an appellate court."    Sec. 1 Chap. 5403 Acts of 1905;
Sec. 1608a Compiled Laws of 1914.

A bill of exceptions may present for review other
matters than a motion for new trial; and even if a mo-
tion for new trial is not duly made and passed upon and
such proceedings properly included in a bill of exceptions,
a motion to strike the bill of exceptions will not be
granted if other matters than the motion for new trial
are properly presented in the bill of exceptions.

The statute above quoted requires an order to be duly
made for extending the time for making a motion for a
new trial, but does not require an order to be made dur-
ing term time that a motion for new trial when duly
made may be heard in vacation.    Before the enactment
of Section 2, Chapter 5403 Acts of 1905 set out in the
main opinion it was held under section 1343 General
Statutes that a motion for new trial duly made in term
time and continued to a day in vacation may be heard
in vacation.    See McGee v. Ancrum, 33 Fla. 499, 15
South. Rep. 231; Sec. 1343 Compiled Laws of 1914.

The Act of 1905 clearly authorizes the trial court to
pass upon a motion for new trial in a civil action in vaca-
tion when such motion had been duly made, but not dis-
posed of, in term time, though no order was made that
the motion may be heard in vacation.

Rehearing denied.

All concur.